We will hear a combined argument in two cases, Sherry White v. Divine Investments, Inc. and Tony Martinez v. Long's Drug Stores Corporation. Do you want to suggest how they're going to divide up the... I think we issued an order to that effect. Hubbard? Good morning. May it please the Court, my name is Stephen Weedle, and along with Lynn Hubbard and Scott Hubbard represent the appellants. I would like to handle that aspect of the appeal that deals with the unencountered barriers and the Pickern decision. I'd like to start by saying, basically distilling down what the defendants are saying Pickern represents. They propose that Pickern represents that a disabled plaintiff only has standing to challenge those barriers that he knew or encountered prior to the filing of a complaint. And several district courts have picked up on this and agreed with defendants. My greatest frustration is that I repeatedly ask both defendants and the courts that have agreed with this, where in Pickern does it say that? It simply does not say that. And in fact, it says the exact opposite. Isn't this the issue that is currently under submission before our Duran panel, on which I believe Judge Doby... It is. That was a Pickern issue related to discovery. Right. So to the extent that we're going to get an answer to that question, as you probably know, this panel would have to take second chair to Duran. I understand that. I would just like to say... Whatever they decide, we're going to have to abide by on it. Correct. I mean, you're welcome to make your record on it, but... Yeah, I would like to add one or two points because I had the privilege of being able to argue Pickern in front of this court in 2002. And I can say without reservation, the issue of unencountered barriers discovered after the filing of the complaint was before this panel. I was asked specifically about that. And I discussed the District of Hawaii case, Parr v. L&L Dryden, at length because they had come to the decision that a plaintiff need not encounter a barrier to have standing to challenge it. And I discovered Parr at length. And I think this is significant because the Pickern case, in addition to citing Steger repeatedly, also cited Parr repeatedly. This issue was very much in front of this court. They were discussing unencountered barriers discovered by Duran's expert 15 months after the filing of the lawsuit. So is your argument to us that you were disappointed that they didn't more fully explain and articulate the holding? To the extent that it's allowed defendants to, quote-unquote, read between the lines and try to make a misinterpretation that's not there, I don't even think you need to read between the lines. You can read the actual lines of Pickern. Well, and we've got two divergent lines of authority now among the district courts as to what that language means. But, again, isn't that the issue that the Duran family cares about? It is. And as you can probably tell, I'm very passionate about this because not only did I argue it, but I knew it was significant. You appreciate your passion and your good argument. I just want to make sure I understand procedurally where we are. Correct, correct. And with that, if you have no specific questions, I'll yield to Mr. Hubbard so he can discuss the path of travel issue. I think that might be a wise use of your time. Thank you. If it pleases the court, Lynn Hubbard on behalf of Sherry White, and I'm going to discuss path of travel and accessible route of travel. The easiest way to explain it is to start with a van accessible sign. Can you speak up a little bit, please? Yes. The easiest way to explain it is to start with a van accessible sign. Now, only one space in eight has to accommodate a van. They have the extra wide access aisle. So the law is very specific. It says there will be an additional sign on the post that says van accessible. It doesn't say additional words on the sign. It says an additional sign. When someone enters a parking lot from a distance driving a van, because they need eight feet, four foot for their lift, four foot for their wheelchair, they look first for signage directing them to the general area that they might park, and then they look for that second sign that says van accessible. But they don't always have to see the sign. They just have to see the second sign so they head there. Are we talking about ER 16 with the picture of the sign on the fence? That's one of the things we're talking about. Okay. And your position is they have to be completely separate, that they can't be on the same placard? No. They can be on the same post, but they can't be on the same sign because from the backside, you wouldn't be able to tell if the space was van accessible or not because you'd only see one sign. And where do you get that requirement out of the regulation? I get that requirement out of 4.6.4 that says an additional sign. And California has very specific ADAG 4.6.4, has very specific rules. So the point I'm trying to make is if you don't see that van accessible sign, then you would have no way of knowing if you can park your van there. But if you could read the sign? Not from the back. Here's the point. I can't tell from the picture on ER 16, but it appears to be a cyclone fence, and there appears to be a van on the other side of the fence, but I can't tell from this picture whether the patrons of the store would actually be encountering the parking lot from the other side of the cyclone fence or not. Well, the issue is if you enter from the southern end of the store, you can't see that sign anyway of somebody's parking spot because it's not up high enough. So the argument is not that it's a combined sign, but it's just not posted high enough? That's one of the arguments, but you can't get by with a combined sign. The reason that you can't get by with a combined sign is very simple. From a distance, if you don't see two signs, then you look right down below that second sign, and if somebody's in that parking space, and only one space out of eight has to be van accessible, then you drive way out to the north 40, or you can take two parking spaces, one for the van and one for the lift, and then you take the accessible route in, which should be marked crossings across the vehicular way. That's why you need the second sign. You shouldn't have to drive around throughout that entire parking lot looking for a second sign and reading the sign. And was the testimony in the record here that that was the problem that the plaintiff encountered when he pulled into the space? It was a she. I'm sorry, Ms. White. And there was record made that the van accessible sign was not there, and then later they put one in that wasn't correct. Okay, but she wasn't complaining about the fact that when she pulled into the parking lot, she couldn't tell which space she was permitted to park? Not initially because she went in to get gas. But she did have complaints about no marked crossing to get into the store as part of the accessible route. But anyway, that's the reason you need the two signs. It's a recognition issue from a distance. I understand your argument. Okay. Now, then the next issue comes up about accessible route. She got stuck in the store because the aisles were too narrow, but she wanted to use the restroom. And this kind of ties into this Title III standing to raise it. If you look at the photographs, number 43 in the plaintiff's supplemental and Plaintiff 66, you'll see that 66 shows a wheelchair sign and an arrow pointing to the restroom. And photograph 43 shows there's 21 inches to get to that restroom. Wheelchairs don't fit through 21-inch openings. There's a big column there that stops her. So she can never ever, buying the defendant's argument, she could never raise Title III standing about the bathrooms and the barriers because she can't get to it. There's no way to get to the bathroom. And that's it. Unless the court has some questions they want me to address, that's all I have to say about the route of travel. All right. Okay. Thank you. Your choice. May it please the Court, John Bilheimer for the defendants Walt and Carolyn Ritchie. I received a notice, an order, saying that the party should limit their discussion at oral argument to the issue of standing. And with regard to the counsel in White versus Ritchie, to discuss the path of travel issues within the store. Am I hearing the court correctly that they don't want to take argument on standing? Well, you're welcome to make whatever record you want. I just wanted counsel to be aware of the fact that so far as this panel is concerned, we are trailing behind the Duran panel on the standing issue as to whether or not a plaintiff has to personally encounter or be aware of any violations in the place of public accommodation. So that however that issue gets decided by the Duran panel, we're going to be bound by it. Okay. I'll be brief. I'll do some bullet points and then I'll go straight to it. I mean, we have your briefs and I think both sides did a good job of briefing the issue. But I just want you to understand that we are not going to have the final word or let me put it the controlling word on the standing issue. Okay. Well, there may be some input, so I'll hit it quickly and move on to the 36-inch wild issue. Standing is measured at the time of the filing of the complaint. It's not to be dispensed in gross. And the Supreme Court has repeatedly said we're not going to relax our rigid standing principles for purposes of judicial efficiency. The court has also stated that the remedy must be limited to the inadequacy that caused the defect. So if we look at Sherry White's complaints at the time of the filing of her complaint, she didn't have actual injury as a result of those purported defects that she neither knew of nor encountered. And when you take those four principles that have been enunciated by the Supreme Court, it's difficult. The plaintiff almost asked for an exception to standing rules, and that's what it should be called is an exception to the standing rules. The Supreme Court's most recent pronouncement on the issue in Hind v. Freedom from Religion is once again a strict one, and plaintiffs must allege, and I quote, personal injury fairly traceable to the defendant's allegedly unlawful conduct. And addressing the one issue that counsel spoke about Pickering, where does it say in Pickering? I'm quoting from Pickering when I say, quote, at some time prior to 1998, prior to filing his complaint, and that prior to filing his complaint is my addition. At some time prior to 1998, Doran visited the Paradise Store and encountered the architectural barriers of which he now complains. In short, at the time of the filing of this complaint, the plaintiff did not have standing to complain of those barriers which she neither knew of nor encountered. The aisle width. The plaintiff's first amended complaint alleged violations of ADAG 4.3, 4.33, and Figures 7a and b, and quoted, no accessible route through store. At least one aisle is less than 36 inches wide. Defendants brought a motion for summary judgment after they had their expert, Kim Blackseth, come in and do his best to fix the purported problems. We introduce evidence at the summary judgment stage. All interior aisles between shelves of goods in defendant's stores are 36 inches wide or greater. That's SER 025. That's our evidence. In opposition, this is the evidence that we get hit with. Access aisles inside the river mark between shelving serving both sides of the retail area does not provide 44-inch minimum width, which violates California Building Code 1133B62. And that's ER 32. Now, the trial court could have stopped right there and said, you didn't meet there what they had to talk about. They were talking about a 36-inch minimum, and they get a declaration that says all aisles are not 44 inches or greater. But the trial court didn't. The trial court then goes to the pictures, which are ñ there's not a great deal of foundation laid for the pictures. And at the excerpts of the record on page 80, 81 and 82 are found in these pictures. These photos show three aisles that are greater than 36 inches and one area that is less than 36 inches. Immediately below the photo in large print, it states, code violation, aisle access does not provide 44-inch minimum width for aisles serving both sides. Now, once again, the trial court could have stopped right there and said, wait, we're talking about a 36-inch minimum here. Why are we talking about the California Building Code, especially the 2001 California Building Code? And so I think the trial court would have been okay in stopping right there, but it didn't. It considered the pictures. And it said three of these pictures present aisles that are 36 inches or greater. Hence, there's two reasons that that suffice. And one is that's ADAG compliant. 4.3.2 says you have to have at least one accessible route 36 inches or greater. And two, the picture does not evidence an aisle in which merchandise is being displayed for public consumption. Every other picture, if you'll note, on 80, 81 and 82, shows goods being exhibited on both sides of the aisle. This one does not. And plaintiff concedes the point in her declaration, in her supplemental declaration at page 111, paragraph 6, that, well, who cares if they're 36? I need 44. And ADAG 4.3.2 states at least one accessible route shall connect accessible buildings, facilities, elements, and spaces that are on the same site. And an accessible route must be 36 inches in width. Counsel, is your interpretation of the ADAAG regulations that as long as a display case has goods that are being offered to the public at the store, then each aisle must be at least 36 inches in width throughout the store? No, it's not. That is not my interpretation. Why doesn't that violate the statutory principle that the premises owner has to provide essentially, you know, equal access to the disabled as is offered to other members of the general public? Well, I think there's two responses to that. One is ADAAG is a safe harbor. So if you complied with ADAAG, you have yourself a safe harbor. Number two is there are alternatives to barrier removal. For instance, retrieving merchandise from inaccessible shelves or racks is permitted. That's 29 CFR 36.305. And on appeal, White posits that more than one accessible route may be needed if it is impossible to connect all of these elements with a single route as is the case here. Now, if you're going to make that argument, you have to present evidence below that these three 36-inch aisles did not connect the basic spaces, elements, and facilities of the store. The trial court, you have to lay a foundation for the court. If you're faced with evidence that says all aisles are 36 inches and you show one picture without explanation, the trial court could disregard that as wholly lacking in foundation, which it did. And you have to argue below. You have to put in some testimony from somebody that can fog a mirror and say these aisles do not connect these elements. So we have something to shoot at. We have to have a target so we can attempt to meet that target and then moot the case. And Ms. White never presented that sort of evidence that these aisles do not connect them. They argue that now for the first time on appeal. Well, let me ask you, on page 81, and there's an aisle that appears to be, what, 33 or 31 inches, I can't tell. Indeed. And that would violate the 36-inch requirement, would it not? It would not. And why would it not, even though it's less than 36? Because, well, number one, if you look at the picture, you'll note that on the right. Do you see on the picture goods on the right? Yeah, I do. Yeah, bakery for fresh donuts. No, but on the right where the aisles go. In other words, can you see how that's a confusing picture? If you're where the aisles go into, you mentioned an area that's heading this way. And you'll note that there's no merchandise or picture of merchandise on that side. And on the left, you can see gas cans. On the left of that photo, you'll see gas cans and janitorial equipment. And so in answer to your question, is if you have one, let's just assume there were goods on both sides. I'd go to ADAG, and it says at least one accessible route. Well, I've got the accessible route. I've got three accessible routes. That would be on your construction. What if you have to have all accessible routes, or all routes at least 36 inches? This wouldn't satisfy that. If that's the construction, but it doesn't just say every single aisle must be 36 inches. It says accessible routes, and then it defines what an accessible route is. Nice. And it says spaces, elements, facilities, buildings. Which you say this picture doesn't show. Which I say that picture doesn't show. And they have to give me evidence so I can at least get a target that says these three aisles that are 36 inches, they have to say they do not connect all the facilities and spaces. So then I can say, huh, I've got to check that out. And I've got to try to beat that and satisfy their requirement because it's a legitimate issue. I think the trial court correctly ruled in this case. Thank you. Good morning, and may it please the Court. My name is Melissa Omansky, and I am here for Defendant Annapelle Longstrugs, California. As I am subject to the September 20th order limiting arguments to standing, and Mr. Bilheimer has addressed the issues of standing as well as the appellee in the Doran case, I will only briefly address a couple of points that I would like to add. And as Mr. Wedel had stated, he's very passionate about his position, so am I. I would first like to emphasize that appellant is misconstruing the plain language of Pickern. And Mr. Bilheimer quoted the section where the court explicitly stated that Mr. Doran, in the Pickern case, had actual knowledge. That's a fundamental difference between that case and the case in Steger and the case in Martinez here. The consequences of such a broad interpretation that goes against the plain language of Pickern are enormous. And here are a few of the problems I see. First, it swallows the doctrine of standing. And as Mr. Bilheimer says, it is an exception to standing and to the plain definition of Article III standing. Second of all, it blurs the limits on injunctive relief. Now, appellant is suggesting that we define the limitations on injunctive relief as barriers which affect the disability of the plaintiff. That is, even if the plaintiff does not have actual knowledge or actually encountered the barriers, he should be able to seek remediation for those barriers that affect his disability. The question I have is how are we going to define disability? Appellant suggests that if Mr. Martinez is in a wheelchair, then he should be able to seek remediation for all barriers that affect a person in a wheelchair. Well, Mr. Martinez was paraplegic. Mr. Martinez's limitations are going to be different than an individual who is quadriplegic and does not have any mobility or function in his upper body, therefore a barrier which appellant might deem to be affecting a person in a wheelchair will not actually affect that particular plaintiff. An example might be if you have a door handle that requires tight pinching or grasping. Well, that was one of the barriers that were addressed in the expert report in Martinez. That would not necessarily affect Mr. Martinez despite the fact that he is in fact in a wheelchair. So what blurs the lines? And the only ability that we have to pose some limitations on it is to follow Article 3 standing. And the next problem I see is that it forces plaintiffs... Can I change it just a little bit for you? Sure. Supposing instead of being paraplegic or quadriplegic, he's blind, okay? Sure. Comes in and he falls over something which shouldn't have been there, structurally shouldn't be there. Are you suggesting that the only step, there may be other structures like this throughout the store, the only one that he can sue for is the one that he stumbled on because he didn't see the other ones? He had no knowledge and there's no way that he could have gotten knowledge because he's blind. Well, I think he could have knowledge of other barriers without actually seeing them. Someone came and told him, you know, watch your step because there are barriers throughout the store. But we're not opposing that. We're opposing the situation where he comes in and has no knowledge. If he was sighted, he'd see them all. I think it's not by virtue of only seeing it. It's that extra element of knowing it and it would actually affect you. Knowing and seeing, fine. If he saw it, he would know it. But he can't see it. He's blind. But it wouldn't necessarily affect him. For example, if he saw that there was not proper signage for a visually impaired person, and I recognize that that's a little bit difficult of an assumption to make, but if we're assuming that he sees the barrier on the women's restroom, and he is a male, does not use the women's restroom, just because he sees the barrier, it affects somebody with his, quote, disability, that is that he is visually impaired, does not mean that he would have standing to seek remediation of that. The problem is by defining someone's disability in terms of, quote, wheelchair, or, quote, visually impaired, or, quote, blind, there are various gradients of visually impaired persons. Doesn't that what Steger's about, the blind person? Well, yeah, but there's got to be some connection to that particular plaintiff. There's got to be some connection to that particular plaintiff. And, yes, it could be something that affects his disability and that he's visually impaired, but if it occurs in the women's restroom, then no, it does not affect him. He does not have standing to seek remediation as to those items. There's got to be something that's more particularized and personal to the particular plaintiff. So you would make standing depend upon personal injury actually suffering? Or the threat of personal injury, the threat of personal injury, and the deterrence of, and that's fair, too. Actually known? When you say the threat of personal injury, it's got to be more than that. If it's just the threat, see what I'm talking about? We're using the blind man and Steger all over again. It cannot be too attenuated. That is true, but he has to have... It's not a question of attenuation. Are you suggesting that there's something more? I apologize. When you say the threat of something happening to him, does it have to be a threat plus knowledge of the threat? Yes, it has to be knowledge of the threat. You've got to have one or the other is our position, yes. It's got to either, and I believe that that's supported by Picker, and it has to be one or the other. If you have actual knowledge of these barriers and actual knowledge of barriers that would actually affect you or injure you in the imminent future and it's not too attenuated, you're never going to go back to the place. We're not talking about that circumstance. Then yes, that does have to be a limitation. Otherwise, we're opening up the floodgates for litigation on issues and barriers that do not affect the particular plaintiff. And the last point in this regard is that it forces the defendants to try to hit moving targets when we're trying to determine when the knowledge of these barriers came about. And Appellant is suggesting that we should allow them, just by virtue of their expert knowledge of this, even though we've got a situation with Martinez where he's been back to the location regularly, never encountered or was even aware of the barriers that were identified by his expert, that he could then remediate those. Well, in Martinez we had three separate reports. We had a preliminary site inspection. We actually had the complaint as well, but listed a whole other set of barriers. We had plaintiff's expert, but listed a different set of barriers. And then finally we had the neutral expert. The defendants are forced to continually hit a moving target, attempt to hit a moving target. The only way to limit that is to find out what this particular plaintiff was affected by. And with that, I submit that the lower court's ruling was proper, and I request that this court so affirm. Thank you very much. Good morning, Your Honors. Highly technical and mind-numbingly boring. Let's start first by identifying yourself for the record. Scott Hubbard, doing the reply in both cases. Before I begin, is there any questions that the panel would like to ask me in light of the defendant's comments during their phase? Well, the one concern I have that I'd like you to address is the interplay. You're arguing that the California Building Code is somehow assimilated into the ADAAG in order to establish a definition of violations, and I'd like to know. Maybe I've misunderstood your argument, but I'd like you to help me understand why I should care about the California Building Code. Of course. With respect to the ADAAG, the A-D-A-A-G is pronounced A-DAG. A-DAG? A-DAG. So when you hear A-DAG references, they're referring to the A-D-A-A-G. We're not arguing that state building code has absolutely anything to do with the A-DAG. The A-DAG is its own separate critter. I can't remember whether or not we described it in either the White Brief or the Martinez. There's parallel rights that you have under the ADA. You have one based on the denial of full and equal enjoyment and use, and you have others based on architectural barriers, which the Department of Justice has defined as being A-DAG violation. Right. Now, if you're seeking a relief for A-DAG violation, the California Building Code doesn't mean squat. You could violate the California Building Code to your heart's content. It's not going to have anything to do with the A-DAG violation. Now, if you're seeking for a denial of full and equal enjoyment and use, and as we learned in Fortney, which is spelled 4D-UNE, Ninth Circuit opinion, we learned that A-DAG compliance, contrary to what defense counsel said, is not a safe harbor to a denial of full and equal enjoyment and use. So in the case of Fortney, it was a movie theater where they said, we have enough accessible seating. Your client wasn't denied full and equal enjoyment and use. He should have just shown up earlier. And the Ninth Circuit panel spent a good four or five pages discussing, no, wait, mathematically, that's not correct. He's limited to these two seats. You need to have a policy in place so that he can use those two seats. And that's the most recent, not the best case in the circuit to describe the definition between use and A-DAG, or at least acknowledge it in publication. You can have an A-DAG compliant facility that a disabled person can't use for whatever reason. And so that's where state law, that's where the building code comes into place. If you have a building code violation that denies someone full and equal enjoyment and use, theoretically, if you look at the congressional record, if you look at the DOJ regs, which I cited to in the briefs, Congress and the Department of Justice seem to recognize that when California or any state has higher building standards, that they have to not only recognize those but actually, I guess, deal with them in the A-DA, where that could affect someone's rights under the A-DA. That's an interesting argument. I guess the question then in my mind is one of supremacy, and that is if the congressional scheme was to delegate to the Department of Justice the authority to promulgate regulations under the A-DA, without regard to whether or not that's a safe harbor, is the state nonetheless free to enact building code violations or building code requirements for violation of which a plaintiff and a federal cause of action may look to in order to establish the A-DA violation? I think if I understood your question correctly, I'm going to repeat it just in my own mind. I think you're focusing on two separate questions. One is the supremacy to preempt state law and, in a sense, incorporate state law into A-DA violations. Well, I mean, what you are arguing is pretty darn close. It's a very clever argument. It is taking the statutory standard of full and equal access to facilities and saying it can't be full and equal access if it violates the California Building Code, even though it complies with A-DA AG. I have an excellent example for you, and I think it's relevant in the White case. Exterior door pressure. The A-DAG is silent. I wanted to hit some of the technical questions that were raised in White. The A-DAG is silent on exterior door pressure. You could have exterior door pressure 100 pounds, which no one could open the size of Superman. Normally, state law, I think the A-DAG, what's the door pressure in state law? Do you know off the top of your head? 8.5 pounds of exterior door pressure. So it isn't silent. The state law has 8.5 pounds. The A-DAG is silent. So you could have a facility that is technically, assuming everything else is correct except that exterior door pressure is 100 pounds, you could have a facility that's technically A-DAG compliant. But from a use point of view, a disabled person couldn't use it because they couldn't get through the front door because the front door violated state law. Isn't that a violation of state law, though? It's a violation of both because you have the type of facility. It is a violation of state law. Which state law is violated? There's a host of them. It's Health and Safety Code Part 5.5. There's the Unfair Business Practice Act, Business and Professions Code 17-200. There's the California Civil Code at Section 51. For which damages and injunctive relief might theoretically be available if the plaintiff prevails. So why do we then have to incorporate that state standard and make it a federal A-DA violation for which injunctive relief and at least a $4,000 civil damage claim is? You don't have to. But that's really what you're asking us to do, are you not? You don't have to. You can do it. It's the motive. As I described in the brief, it's the motive. You have someone who is unable to use a facility. Let's not characterize evidence that establishes a violation as the motive. The question is whether or not it establishes a violation, not whether the defendant did it intentionally or negligently. Fair enough. If the door pressure, if she couldn't open the door, you don't even have to look at the state law. You don't even have to look at the building code regulations. You don't even have to touch on it. It's a denial of full and equal enjoyment of a public accommodation. It's a denial of enjoyment. And the denial is equal across the board because at 100 pounds, you said we couldn't open it. So we couldn't get into it either. Ten pounds. Something that I could open, but the average quadriplegic like Mr. Martinez or Sherry White, you don't even have to look to the state law. That's why I mean it's a motive. Characterize evidence as motive insofar as it just doesn't matter. I have three minutes. I understand your theory. Why don't you move on to the other points? Fair enough. Let me start through very, very quickly. My father stressed the importance of van accessible signage, having a separate sign. If you look at page ADAC section 4.1.2B, it says that one out of every eight accessible parking spaces has to be van accessible parking. That's why that second sign is so important. So you can spot it from a distance which one you're going to. And it's such an important issue that when the... Where do you get the spotting part though? I understand the obligation on the part of the property owner to make the space available. Where I had a hard time following your father's argument was how it's a space if the patron who is disabled can't determine from a distance of 200 yards away that that is a space. I mean, what's the harm in requiring the patron to drive a little closer to the designated parking areas in order to determine which space has been so designated? Because those eight spaces might not be clumped together. So you have to be able to see from a distance which accessible parking space is the one with the van. That assumes that the patron can't drive through the parking lot and look for the other space? Well, I don't know if it's an assumption or not. It's what the DOJ wanted. And if you look at 4.64, which actually is the section that requires it, it italicizes additional signage. I mean, my mom, we speak from personal experience. My mom's a paraplegic. She's in a wheelchair. We drive a van accessible van. We look for that sign. So that's the importance of it. It's not theoretical. Going on, comments were talked about the width of the aisles. If you look at the exercise of record 81, I've done this long enough. I would point out to you that they do have a lot of machine there. There is something on that aisle. It is used. So it's required to be 36 inches. And even if it wasn't, if you look at the, so your position, contrary to the property owner's position, is that every aisle in the store where a patron might walk. Has to be at least 44 inches. Why? I wouldn't say every aisle because the DOJ doesn't say every aisle, but it's more than one. He would, he would, he says, we have three and. So 75. So he's not supposed to, you know, I've heard the argument before, and it's been made before that we only need to provide one accessible route through the store. And one accessible route means one aisle. And my question to you is if one is not good enough, your position is all of them don't have to be equally accessible. So something between one and all, and where does that leave me in trying to interpret the law here? I paused because the Department of Justice promulgated regulations that discussed large, large Macy's type facilities. So if you have like a fixed aisle, yes, the fixed aisles, if they have merchandise on the aisle, they have to be at least 36 inches wide. If you're talking about movable displays or something like Macy's where you have one main path, and then little, little island that's, that's out there. And so that's what the pause. And one last point. This is a question of credibility at this point. There are, you know, a lot of defenses arguments were questions of credibility of the experts, of the evidence, the experts, it was, you know, that's what it boiled down to pictures, right? The burden is on you to establish the ability of the evidence. The picture establishes in the one that we're referring to in paragraph 80, or excuse me, ER 80. The picture establishes it's a fixed aisle, that it has a lot of machines on it, and that it's under 36 inches. That's a tribal issue of fact of whether or not that was, whether or not that, well, whether or not that warranted summary judgment, I would argue based on those facts that warranted summary judgment in our favor, but reasonable minds can disagree with the district court grant you summary judgment. If, if the district court doesn't know what the law requires in terms of the width of all of the aisles, we all the district court knows from looking at exhibit 81 or ER 81, is that some aisles are wider than other eyes. Well, yeah, but the photo and the argument, thank you. Summary judgment on that. They have to take the Congress and I'm over my time. I forgive. Congress and the department of justice said that you accept the most stringent standards when you're determining the accessibility of a, of a facility. And we cite to those in our brief, the most stringent standards in this case is 44 inches. When our expert went in, he operated off of the most stringent standards and that's 44 inches. So most stringent standards from the CBC or from the ADA, CBC, but even on the 80, even on the ADAC, it was still, we are incorporating the CBC sort of as a second set of regulations under the ADA, although you don't want to characterize it. You know, I do want to characterize it because I think their support in the congressional record and the department of justice, that this is what they intended. States would be free to promulgate different building codes with differing widths. And those could all serve as a violation of a federal ADA claim. Two points. If a, it provided, if it denied, if, well, first off, yes, as long as it was greater than the ADAC and B, as long as that standard, a failure to comply with that standard would deny a disabled person full and equal enjoyment under the law. It's that first section, ADA section 302, a, that is the alpha. And that is the Omega of title three. If you can see anything that falls under the purview of that is a title three ADA violation. Now, if you can characterize it as such or not, well, we'll figure out how to characterize it when we, when we get the resolution out. Thank you very much. Counsel, the case, just both cases just argued are submitted for decision.
judges: Thompson, Tallman, Duffy